United States District Court

For The Northern District of Ohio

FILED
2:15 pm Feb 26 2026
Clerk U.S. District Court
Northern District of Ohio
Youngstown

Brian DiPippa,

Petitioner,

V.

Warden, FCI-Elkton,

Respondent

No. 4:26 CV 00487

JUDGE FLEMING

MAG JUDGE ARMSTRONG

Motion Pursuant to 28 U.S.C. § 2241 And Incorporated Brief in Support Thereof

Now comes the petitioner, Brian DiPippa, proceeding Pro Se, alleging that Bureau of Prisons (BOP) officials at FCI-Elkton are improperly executing his sentence in violation of the First Step Act of 2018 (FSA). Accordingly, this motion is filed in pursuant to 28 U.S.C. § 2241 and requests this Court to intervene on his behalf.

## I.Jurisdiction and Scope

A motion pursuant to 28 U.S.C. § 2241 may be filed in the district in which an inmate is housed. 28 U.S.C. § 2241 (D). The petitioner is currently housed at FCI-Eltkon in Lisbon, Ohio, affording this Court Jurisdiction. See https://www.bop.gov/inmateloc/.

The earning and application of time credits accrued via FSA directly impacts the timeframe under which petitioner will spend incarcerated. This represents an established liberty interest within the scope of a Section 2241 filing. See, for example, Cargill v. Healy, U.S. Dist. Lexis 73167 (N.D. OH. 2024).

## II.Administrative Exhaustion

BOP staff at FCI-Elkton erected extralegal barriers in an effort to thwart the petitioner from exhausting his administrative remedies. In spite of this reality, petitioner has provided ample notice of these issues and attempted to resolve them with every level of the BOP. The petitioner will present his issues to the Court chronologically.

The petitioner began local exhaustion on his first issue on 07/31/25.[Exhibit 1] He followed up with a BP-9, which was denied on 10/08/25. [Exhibit 2]; [Exhibit 3] Petitioner next filed with the Northeast Regional Office of the BOP (NERO), who failed to reply in a timely fashion. [Exhibit 4]. Per policy he was permitted to advance his claim to the BOP's Central Office after 30 days. See 28 C.F.R. § 542.10. The petitioner finalized his exhaustion with the BOP on 11/24/25. [Exhibit 5].

The petitioner encountered administrative resistance in exhausting his remedies on his second issue, however, petitioner followed BOP policy and ensured that every level of the agency was fully informed of his claim. He began by filing a BP-8 with his case manager on 07/08/25. [Exhibit 6]. Policy allots his Unit Team 20 days to respond; they failed to do so. ID. When the petitioner requested an update from his Case Manager after 20 days, he was told no progress had been made and was asked to wait. [Exhibit 7]. He did so, but was given no answer, so he advanced his argument to his Warden via BP-9 after waiting two more weeks. [Exhibit 8]. Warden Healy refused to accept his filing because the petitioner's Case Manager would not fill out the staff response portion of the BP-8.* [Exhibit 9] He gave petitioner five days to correct this error, although the only error was a Case Manager who would not fill in his part of the form. ID. The petitioner attempted to comply with his Warden's instructions by messaging his Case Manager. [Exhibit 10]. He was ignored. [Exhibit 7].

* Had petitioner attempted to open another ticket on the same topic it would have encountered the same blockade as his already open ticket, and additionally be dismissable as redundant. See 28 C.F.R. § 542.10.

BOP policy specifically prohibits an institution from interfering with an inmate's efforts to utilize the administrative remedy process. 28 C.F.R. § 542.10. Nonetheless, petitioner's warden would not accept his BP-9 until his Case Manager "signed off" on his BP-8, which his Case Manager refused to do in spite of that policy. [Exhibit 7]; [Exhibit 9]. Lacking any local remedy, the petitioner followed policy and sent notice of this issue, along with his argument regarding his owed time credits. [Exhibit 11]. He included copies of his BP-8, BP-9, rejection notice, and his e-mail to his Case Manager. [Exhibits 6-10]. NERO rejected his claim on the grounds that his Warden would not accept his BP-9. [Exhibit 12]. They suggested he "make corrections" to his BP-8, although the two components filled out by an inmate (the problem and relief requested) were already complete and correct. [Exhibit 6] [Exhibit 12]

Petitioner again complied with policy and informed Central Office of the impossibility of his situation and reiterated his time credit argument. [Exhibit 13] This too was rejected by the BOP without consideration on identical, impossible to satisfy grounds. [Exhibit 14]

Petitioner has attempted to fully exhaust administrative remedies with every level of the BOP and has spent a significant amount of time and effort visiting offices and sending messages to various staff at his prison. [Exhibit 7]; [Exhibit 10]; [Exhibit 15]; [Exhibit 16]. The administrative record is extremely well-developed by the petitioner in this case and the BOP has been afforded ample notice of the issues before the Court. There should be no doubt that the petitioner has fully exhausted his remedies with both of his claims.


## III. Argument

Petitioner seeks FSA Time Credits (FTCs) during two distinct time periods during which the BOP presently denies him those FTCs - from 01/06/25 until 02/26/25 (Argument 1), and from 02/26/25 until 05/08/25 (Argument 2). The BOP began awarding the petitioner credit thereafter. [Exhibit 17].

(1). Petitioner earned FTCs from 01/26/25 to 02/26/25.

A. An eligible inmate may begin earning FTCs from the sentencing date.

Congress passed FSA with clear language describing excluded periods of time when an inmate was ineligible to earn FTCs. "A prisoner may not earn time credits ... during official detention prior to the date that the prisoner's sentence commences under section 3585(a)." 18 U.S.C. § 3632(d)(4)(B). Likewise, the commencement of a prisoner's sentence is defined quite simply. "A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." 18 U.S.C. § 3585(a).

The BOP introduced confusion into the mix when bureaucrats created official policy inconsistent with the law. 28 C.F.R. § 523.42 redefines the commencement of an inmate's sentence to begin when an inmate arrives at their facility. See, for example, Brenneman v. Warden Salmonson, 2025 U.S. Dist. Lexis 56851 (E.D. Tex. Feb. 25, 2025) (finding the "BOP's use of §523.42 to redefine when a sentence commences is plainly inconsistent when the statutory language adopted by Congress"); see also, Gale v. Warden FCI Milan, 2025 U.S. Dist. Lexis 8739 (E.D. Mich. Jan. 16, 2025)(Noting the same).

The law is plain and clear, Moreover, It is not subject to "reinterpretation" by unelected public officials.

B. Petitioner successfully programmed to the best of his abilities throughout this period.

FSA awards time credits to an eligible inmate "who successfully completes evidence-based recidivism reduction programming (EBRRs) or productive activities (PAs)" 18 U.S.C. § 3632(d)(4)(A).

The BOP self defines an EBRR Program as either a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on

research indicating that it is likely to be effective in reducing recidivism. Programs may include, but are not limited to, those involving the following types of activities: (1) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills; (2) Family relationship building, structured parent-child interaction, and parenting skills; (3) Classes on morals or ethics; (4) Academic Classes; (5) Cognitive behaviour treatement; (6) Mentoring; (7) Substance abuse treatment; (8) Vocational training; (9) Faith-based classes or services; (10) Civic engagement and reintegrative community services; (11) Inmate work and employment opportunities; (12) Victim impact classes or other restorative justice programs; and (13) trauma counseling and trauma-informed support programs. 28 C.F.R. § 523.41.

Likewise, a Productive Activity (PA) is defined by the BOP as a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating. "Productive activities include a variety of groups, programs, classes and individual activities which can be structured or unstructured. These pro-social activities contribute to an inmate's overall positive institutional adjustment, to include maintaining clear institution conduct, and include, but are not limited to: structured, curriculum-based group programs and classes, Productive free-time activities (E.G. recreation, hobby crafts, or religious services), Family interaction activities (E.G. social visiting), Personal growth and development classes, Institution work programs, Community service projects, [or] Participation in an Inmate Financial Responsibility Plan."  28 C.F.R. § 523.41.

So, in essence, EBRRs are courses backed by research to reduce recidivism, whereas PAs encompass nearly any other positive hobby or interest of an inmate. Both listings are quite broad and include the standard faire utilized at jails and prisons throughout the world. These definitions are wide enough to include inmates who are merely sitting on a waiting list to take a class (as opposed to actually

being actively enrolled), taking an art class at recreation, watching a faith-based movie at the chapel, or even just responsibly paying down their financial obligations through the courts. In other words inmates receive FTCs by staying out of trouble and taking the usual classes which prisons offer.

Petitioner performed well as an inmate during January and February of 2025. He spent the period in question at two different facilities - Butler Country Prison and the Northeast Ohio Correctional Center (NEOCC) [Exhibit 7]. He worked jobs, attended religious services, and availed himself of a variety of pro-social activities including educational, leisure, and fitness programs. ID. He incurred no disciplinary infractions. ID. He made substantial progress toward paying off his Court-ordered fines, fees, and restitution by completing over half of his owed total (which exceeded more than $50,000) ID. To put this into perspective, BOP policy considers an inmate who participates in the Financial Responsibility Program (FRP) by paying as little as $25 a quarter to be "successfully participating" for FSA purposes. See PS 5220.01; PS 5410.01. Moreover, as soon as he was permitted to do so, he promptly took the BOP's survey and signed up for the appropriate courses, demonstrating a clear willingness to rehabilitate himself. ID.

Withholding FSA credits from an earnest and growth-minded inmate who engages in appropriate activites exceeds the limits of the BOP's authority.

C. It would be wrong to withhold FTCs based upon misconceptions or technicalities.

Decisions on similar situations have been mixed throughout the country. Petitioner believes his situation compares favorably and deserves relief.

First, a number of district courts denied relief to petitioners who fail to provide any evidence that they made productive use of their time while in federal custody waiting to arrive at their designated facility. See, for example, Taitano v. Warden, FDC Honolulu, 2025 U.S. Dist. Lexis 164740 (D. Haw. Aug.25 2025) (noting that "Taitano has offered no evidence that she actually participated in any

programming or productive activities"); Williamson v. Warden, FPC Alderson, 2025 U.S. Dist. Lexis 181661 (S.D.W.V. July 25, 2025)(finding" [D]espite the conflict between the statutory language and the agencies interpretation of 'commencement of sentence' the undersigned agrees... such conflict does not automatically entitle a prison to an award of FTCs on the date he or she is sentenced"). Petitioner agrees with these courts, but notes that this argument does not apply to his situation. He is part of a distinct subset of inmates in federal custody who both avoided disciplinary issues and voluntarily engaged in betterment programs which were made available to him. Furthermore, he offers evidence of these facts. [Exhibit 7]; [Exhibit 18] - [Exhibit 21].

Another common reason for rejection is that a petitioner cannot earn FTCs until they take the BOP's survey, or unless they complete the specific classes the BOP recommends for them. See, for example, Gustinski v. Joseph, 2025 U.S. Dist. Lexis 149247 (D.S.C. July 3, 2025)(declining to grant relief when a defendant had "not demonstrated that the BOP had conducted an assessment to determine the type and amount of programming appropriate for Petitioner at that time. Instead, the evidence in the record indicates that the BOP conducted such an assessment only after Petitioner arrived at his designated BOP facility"). Petitioner contends this analysis is inappropriate in his case for several reasons.

The first is that the BOP has recommended only 3 needs areas at various points to the petitioner - Medical, and Rec/Leisure/Fitness (at his March, 2025 Unit Team) and Substance Abuse Counseling (at his September, 2025 Unit Team). [Exhibit 23]; [Exhibit 24]. Petitioner engaged in pro-social activities, including programs which address some of these needs, prior to his arrival at his designated facility. [Exhibit 7]; [Exhibit 18] - [Exhibit 22]. His programming included movie and speaker discussion events, in-unit trivia competitions, leisure and fitness activities, attending religious services, and working jobs in culinary and custodial areas. ID. He even aided in organizing a spoken-word exhibition for inmates featuring poetry readings. ID. His activities are comparable to, for

example, Brain Health as You Age, Arthritis Foundation Walk with Ease, Faith-Based Conflict Management, Hydroponics and Gardening, and Seeking Safety or Seeking Strength (which address needs in Medical, Recreation, Congitions, and Anti-social peers, amongst others). In short, the petitioner would argue that his activities were addressing those needs areas which the BOP would diagnose, once they got around to diagnosing those needs. He behaved just as a productive inmate ought to.

The second reason such an analysis falls short is that it punishes inmates for the purposeful alteration of the law by the BOP. Universally, courts have observed that the BOPs regulation "runs afoul [of] the unambiguous eligibility requirements of the FSA", but some courts try to justify the BOPs extralegal hurdle on the grounds that "because his individualized assessment had not yet occured, those programs could not have been recommended based on an individualized assessment." See Tantuwaya v. Birkholz, 2024 U.S. Dist. Lexis 209454 (C.D. Cal. Oct 10, 2024); Stark v. Lammar, 2025 U.S. Dist. Lexis 157533 (N.D. Ill. Aug 14, 2025). Stark ignores that the BOP refuses to provide this survey to inmates (which is a fifteen minute survey available in both electronic and paper format) until a defendant arrives at a designated facility. 28 C.F.R. § 523.42. Likewise, their EBRRs and PAs are only made available at BOP institutions, in plain violation of Congress' intent that the BOP "provide all prisoners with the opportunity to actively participate in [EBRR or PA] programs... throughout their entire term of incarceration." Wong v. Warden, 2024 U.S. Dist. WL 4027918 (D.S.D. 2024), quoting 18 U.S.C. § 3621(h)(6). (Emphasis Original). Put bluntly, the "delay should not be borne by the prisoner" when the BOP chooses to withhold options from its wards. Puana v. J.F. Williams, 2024 U.S. Dist. WL4932514 (D. Colo. 2024). Moreover, to allow them such latitude ignores the Supreme Court's indication that such administrative deference is inappropriate. See Loper Bright Enterprises v. Raimondo, 144 S.G. 2244 (2024).

The third reason such a hardline stance against earning credits prior to taking

the SPARC-13 needs survey is that the BOP applies this restriction inconsistently. "[I]n two other cases concerning this issue, the BOP has conceded that it permits inmates to earn FSA time credits for programming that was not specifically assigned to them or was completed before the risk and needs assessment was performed. "Claude v. Stover, 2025 U.S. Dist. Lexis 18605 (D. Conn. Feb. 3, 2025)." Based on these submissions, it appears that BOP does not consider section 3632 as creating an absolute requirement that FSA time credits may only be awarded after the risk and needs assessment has been completed and only for programs specifically assigned to an inmate based on that assessment. Consequently, the Court will no longer endorse such a rigid interpretation of the statute." ID.

Petitioner has made every effort to reform his life and comply with institutional rules. He was not afforded the opportunity to take the BOP's survey, but he engaged in appropriate programming per what it later recommended on his own volition. It would penalize the wrong party to hold him accountable for the BOP's failure to fully adopt and administer FSA.

(2) Petitioner earned FTCs from 02/26/25 to 05/08/25.

A. Background

The Bureau has an admittedly difficult talk in managing the federal prison system. That said, its unwillingness to comply with FSA has drawn negative attention from the Senate, the courts, and even the agency's own Director. [Exhibit 25]. The "bureaucratic inertia" Director Marshall bemoans is on full display in the petitioner's case.

Petitioner's Unit Team paperwork confirms that he arrived at FCI-Elkton on the week of February 26, 2025. [Exhibit 23]. He completed the SPARC-13 needs survey on the computer the day after arriving - quite literally as the first chance, as TruLincs logins are inactive the day of arrival. [Exhibit 7]. Six days later he joined the waitlist for his first EBRR, the Non-Residential Drug Abuse Program (NRDAP). [Exhibit 23]. NRDAP addresses multiple needs areas including substance

abuse, an area the BOP agrees that the petitioner should take classes upon. See
FSA Approved Programs Guide, BOP (2025); [Exhibit 23]. An inmate who joins a
waiting list for an EBRR in a needs area they require is considered to be
"successfully participating." See PS 5410.01(3)(c).

His first indication that something was amiss came nearly a month later at his
initial classification Unit Team on 03/20/25. [Exhibit 23]. Petitioner's Case
Manager inquired if he had taken the FSA needs survey. [Exhibit 7]. When the
petitioner answered in the affirmative, his Case Manager indicated that "there is
sometimes a delay in posting" and suggested he double-check his survey tab in
TruLincs. ID. Immediately after the meeting the petitioner verified that no surveys
were available in his profile. ID.

Over the next few weeks the petitioner attended his Case Manager's open house
(a once per week hour when inmates were permitted to ask questions), and he was
told each time his survey had not posted still and to check back later. [Exhibit 7]
On May 6, 2025, his Case Manager indicated that petitioner's electronic survey
"still hadn't taken". ID. He handed the petitioner a paper survey to complete. ID.
The petitioner wrote "Retake of 02/27/25" next to the date line, and he took the
surveys a second time. ID.

When petitioner discovered later that the BOP was withholding FTCs from
02/27/25 (when he first took the survey and signed up for recommended classes) and
05/06/2025 (when he completed the same survey on paper), he did everything
imaginable to solve the issue. He talked with a multitude of BOP employees, sent
e-mails, and eventually resigned himself to filing administrative rememdies.
[Exhibit 6-16]. The petitioner recognizes this court's time is valuable, so he
does not herein recount his experience fully, but he includes a more thorough
accounting as a sworn affidavit. [Exhibit 7]. The record details his substantial
efforts in gaining the credits he earned, and the significant administrative
interference which he encountered in trying to resolve this issue. [Exhibit 6-16].

Since arriving at his designated facility, petitioner has been a success story by any objective measure. He has incurred zero disciplinary infractions, lowered his PATTERN recidivism score to low / minimum, moved to the "honor unit" and fully satisfied over $50,000 in Court-ordered fines, fees, and restitution. Clearly petitioner is taking his sentence seriously. Moreover, he took his needs survey immediately upon arriving at his facility and promptly signed up for the betterment programs which BOP staff recommended.

B. There is no basis in law to deny petitioner the FTCs that he earned.

The petitioner's first argument would be that he fully complied with both FSA and the BOPs extralegal policy statement. Even utilizing the BOP's policy, petitioner fully complied with each aspect of "successful participation" 28 U.S.C § 523.41(c). He arrived at his facility and swiftly completed the SPARC-13 needs assessment. [Exhibit 7]. Upon talking with BOP staff responsible for administering EBRRs, he enrolled in the recommended courses he was offered - the very same classes his needs survey recommended in both March, and again in September. [Exhibit 7]; [Exhibit 23]; [Exhibit 24]. That his Case manager (who is not the staff memeber responsible for enrolling petitioner in his EBRRs anyway) could not see the results of the first survey due to an electronic glitch is not material to FSA nor the policy. 18 U.S.C. § 3632(d)(4); 28 C.F.R. § 523.41(c).

Even assuming for the sake of argument that the petitioner first took his needs survey in May (which seems implausible given his sworn affidavit to the contrary, detailed recordkeeping, printouts of electronic messages, and the BOP's unwillingness to accept his filings on the matter), it would still be sensible for the Court to award the petitioner credit for this span. This is because numerous courts have already found that when the Bureau is slow to assess inmates, that tardiness ought not be held against a prisoner who is earnestly programming. See, for example, Dunlap v. Warden, FMC Devens, 2024 U.S. Dist. Lexis 235866 (D. Mass. 2024) (finding it "palpably unfair" to deny credits to an inmate who

"plainly sought to participate in programming"); Dunaev v. Engleman, 2025 U.S. Dist. Lexis 106421 (C.D. Cal. Apr. 28, 2025)(noting that "[a]ny such unreasonable delay on the part of the BOP in assessing the prisoner should not inure to the detriment of the prisoner").

Moreover, the BOP has admitted in other cases that their policy allows for inmates to earn credits for participating in unassigned programming so long as they have enrolled in suggested courses. See Perevoznikov v. Stover, 747 F.Supp.3D 329 (D. Conn. 2024) (BOP conceeding the same). During this period petitioner was enrolled in NRDAP (an EBRR recommended by both staff and his needs survey) and completed multiple additional classes. [Exhibit 23]; [Exhibit 24]. Additionally, the BOP has admitted in other cases that its policy "permits inmates to begin earning FSA time credits immediately upon arrival at designated facility even if risk and needs assessment has not been completed. "Claude (citing Mohammed v. Stover, 2024 U.S. Dist. Lexis 73508 (D. Conn. 2024) (Emphasis added)). Should the BOP refuse the petitioner's request for FTCs during this period, they would be violative of law, and they would be rejecting their prior position on their own policy.

By fact, law, and policy petitioner earned time credits during the period in question.

## IV.Petitioner's Statement

I, Brian DiPippa, hereby avow that I am the petitioner, that I have read this filing fully, and that I do swear under penalty of perjury that all factual statements herein are true and correct to the best of my knowledge.

So Sworn,

Brian DiPippa — 02|18|2026

Brian DiPippa #66590-510
FCI-Elkton
P.O. Box 10
Lisbon, OH 44432

Date

## V.Relief Requested

The petitioner requests that this Court issue an order directing the BOP to immediately re-evaluate him for FSA time credits for each period to confirm his assertions herein, and to update his FSA Time Credit Assessment and projected release date accordingly.

Placed into my institution's legal mail on: 02/20/2026