**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRIAN DIPIPPA, | ) | Case No. 4:26-CV-00487-CEF |
| | ) | |
| Petitioner, | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| WARDEN, FCI ELKTON, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT & RECOMMENDATION** |

## I.  INTRODUCTION

Petitioner, Brian DiPippa ("Mr. DiPippa"), seeks a writ of habeas corpus under 28 U.S.C. § 2241. (ECF No. 1). Mr. DiPippa is currently serving a 60-month sentence for violations of 18 U.S.C. §§ 2, 231(a)(3), and 371. Mr. DiPippa asserts that he is entitled to habeas relief because the Bureau of Prisons ("BOP") has denied him time credits to which he is entitled under the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ("FSA").

This matter was referred to me on March 25, 2026 under Local Rule 72.2 to prepare a report and recommendation on Mr. DiPippa's petition. (ECF No. 3). On May 8, 2026, Respondent, Warden, FCI-Elkton ("Warden"), filed a return of writ and motion to dismiss Mr. DiPippa's petition. (ECF No. 16).

For the reasons set forth below, I recommend that the Court GRANT Mr. DiPippa's petition for a writ of habeas corpus and DENY the Warden's motion to dismiss. I also recommend that the Court order the Warden to recalculate Mr. DiPippa's FSA time credits within 14 days of the Court's order adopting my report and recommendation. Finally, I recommend that the Court ORDER the Warden to file a status report within three days of the

1

deadline to recalculate Mr. DiPippa's FSA time credits, confirming that the Warden has complied with the Court's order.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  <u>FSA Time Credits</u>

In 2018, Congress enacted the FSA, which "established a system where eligible inmates can participate in evidence-based recidivism reduction programs to earn time credits toward their sentences." *Nycklass v. Healy*, No. 4:23-cv-2166, 2024 WL 1054408, at \*1 (N.D. Ohio Feb. 15, 2024). Under the FSA, an eligible prisoner "shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities" ("EBRR" programs and "PAs"). 18 U.S.C. § 3632(d)(4)(A)(i). A prisoner may also earn an additional five days of credits for every 30 days of successful participation in programming or activities if the prisoner is "determined by the Bureau of Prisons to be at a minimum or low risk for recidivating" and has not increased their recidivism over two consecutive assessments. 18 U.S.C. § 3632(d)(4)(A)(ii).

The statute defines an EBRR program as a program that "has been shown by empirical evidence to reduce recidivism" or will "likely . . . be effective in reducing recidivism" and "is designed to help prisoners succeed in their communities upon release from prison." 18 U.S.C. § 3635(3)(A)-(B). The statute also defines a PA as an activity that is "designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating . . . ." 18 U.S.C. § 3635(5).

§ 3632(d)(4)(C) provides that time credits for eligible prisoners "shall be applied toward time in prerelease custody or supervised release" and that the Director of the BOP "shall transfer eligible prisoners . . . into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). § 3624(g) also provides that a prisoner "shall be placed in prerelease

custody" if the prisoner (1) has earned credits equal to the remainder of the prisoner's term; (2) has maintained a minimum or low recidivism risk or has shown a demonstrated recidivism risk reduction; (3) has had the remainder of their term computed under applicable law; and (4) has been determined to be a minimum or low risk to recidivate for two consecutive assessments or has had an application for transfer to prerelease custody or supervised release approved by the warden of the prison. 18 U.S.C. § 3624(g)(1)(A)-(D) and 18 U.S.C. § 3624(g)(2).

### B.  Mr. DiPippa's Sentence and FSA Time Credits

On January 6, 2025, Mr. DiPippa was sentenced in the United States District Court for the Western District of Pennsylvania to a term of 60 months in prison for violations of 18 U.S.C. §§ 2, 231(a)(3), and 371. (ECF No. 16-1, § 2).

Following his sentencing, Mr. DiPippa attests that he was housed at two facilities, Butler County Prison and the Northeast Ohio Correctional Center (NEOCC). (ECF No. 2-7). Mr. DiPippa says that he was at Butler County Prison from January 6, 2025 until January 8, 2025, and that he was housed at NEOCC from January 8, 2025 until February 26, 2025. *Id*. The Warden does not dispute those dates.

Mr. DiPippa asserts that, while he was incarcerated at Butler County Prison and NEOCC, he participated in various EBRR programs and PAs, including serving as a kitchen worker and unit orderly, engaging in recreational activities and religious study, and attending movie and speaker discussion events. *Id*. In addition to his own statements, Mr. DiPippa supports his assertion with declarations from four other prisoners who say they saw him engage in those activities. (ECF Nos. 2-18, 2-19, 2-20, 2-21).

On February 26, 2025, Mr. DiPippa was transferred to FCI Elkton. (ECF No. 2-7; ECF No. 16-1, ¶ 6). Mr. DiPippa asserts that he completed his risk and needs assessment

surveys the next day, including a survey known as the SPARC-13 needs survey. (ECF No. 2, PageID # 22; ECF No. 2-7). Mr. DiPippa also asserts that he began joining waitlists for EBRR programs shortly thereafter. *Id*.

Approximately a month after Mr. DiPippa says he completed the SPARC-13 survey, his case manager allegedly inquired as to whether Mr. DiPippa had taken it. (ECF No. 2-7). When Mr. DiPippa informed his case manager that he had already completed the survey, the case manager allegedly informed him that there was sometimes a delay in posting the survey. *Id*. Mr. DiPippa attests that his case manager told him several times over the next month that the survey still had not posted. *Id*. Mr. DiPippa alleges that there is a known issue with FSA survey results not properly posting.

On May 6, 2025, Mr. DiPippa's case manager allegedly informed him that the survey still had not posted and advised Mr. DiPippa to retake the survey, which he says he did. *Id*. That survey was processed on May 8, 2025. (ECF No. 16-1, ¶ 7; ECF No. 16-1, PageID # 133). The Warden does not respond to Mr. DiPippa's assertion that he completed the survey on February 27, 2025 but that the survey was somehow lost in the system.

Mr. DiPippa alleges that he engaged in qualifying activities between February 27, 2025 and May 8, 2025 that should have earned him FSA time credits, including joining the waitlist for a non-residential drug abuse program and signing up for recommended classes. However, Mr. DiPippa alleges that the BOP has refused to award him any FSA time credits for those activities.

Mr. DiPippa was incarcerated at FCI Elkton at the time he filed his petition. (ECF No. 1). He is now in prerelease custody at Pittsburgh Residential Reentry Management. *See* https://www.bop.gov/inmateloc/ (*last accessed* July 29, 2026). The BOP currently calculates

4

his release date as March 26, 2027. *Id*.

### C.  Mr. DiPippa's § 2241 Habeas Petition

On February 20, 2026, Mr. DiPippa, acting *pro se*, filed his 28 U.S.C. § 2241 habeas petition. (ECF No. 1). Mr. DiPippa's habeas petition raises two grounds for relief:

1.  Petitioner earned FSA days from 01/06/25 to 02/26/25.

2.  Petitioner earned FSA days from 02/26/25 to 05/08/25.

*Id*.

On May 8, 2026, the Warden filed an answer/return of writ and motion to dismiss Mr. DiPippa's petition. (ECF No. 16). On May 22, 2026, Mr. DiPippa filed his traverse. (ECF No. 17). On May 29, 2026, the Warden filed a reply to Mr. DiPippa's traverse. (ECF No. 18).

## III. ANALYSIS

### A.  Jurisdiction

It is well-settled that a prisoner may file a § 2241 petition challenging the BOP's calculation of good time credits or its decision to deprive an inmate of those credits. *See Julick v. Synder-Norris*, No. 16-6652, 2017 WL 5485453, at *1 (6th Cir. Mar. 1, 2017) ("Habeas corpus jurisdiction exists under § 2241 when a prisoner claims that he was deprived of good-time credits without due process of law."); *Purley v. Toledo Fed. Court*, No. 3:24-CV-01211-JRK, 2025 WL 240737, at *6 (N.D. Ohio Jan. 17, 2025), *report and recommendation adopted*, 2025 WL 581090 (N.D. Ohio Feb. 21, 2025) ("A claim challenging the computation of FSA credits can be addressed in a § 2241 petition."). The Court therefore has jurisdiction

over Mr. DiPippa's petition.[1]

### B. Whether Mr. DiPippa was Eligible for FSA Time Credits Before his Transfer to FCI Elkton

In his first ground for relief, Mr. DiPippa asserts that the Warden is improperly denying him FSA time credits he earned between January 6, 2025, the date on which he was sentenced, and February 26, 2025, the date of his transfer to FCI Elkton. The Warden responds that Mr. DiPippa was not eligible for FSA time credits until he arrived at FCI Elkton and that he has not presented evidence that he engaged in eligible activities at his prior institutions. I disagree.

While a prisoner cannot earn FSA time credits "prior to the date that the prisoner's sentence commences under section 3585(a)," 18 U.S.C. § 3632(d)(4)(B)(ii), the FSA provides that the BOP must give eligible prisoners "the opportunity to actively participate in [EBRR] programs or [PAs] . . . . according to their specific criminogenic needs, throughout their entire term of incarceration." 18 U.S.C. § 3621(h)(6). Under the FSA, a prisoner's sentence "commences" on "the date the defendant is received in custody awaiting transportation to . . . the official detention facility at which the sentence is to be served." 18 U.S.C. § 3585(a).

The BOP has promulgated a number of regulations to implement the FSA. Relevant here, 28 C.F.R. § 523.42(a) provides that a prisoner's sentence does not "commence" for purposes of eligibility for FSA time credits until the "date the inmate arrives . . . at the designated [BOP] facility where the sentence will be served." 28 C.F.R. § 523.42(a). Mr. DiPippa argues that, because § 523.42(a) conditions the start of a prisoner's sentence on the

---

[1] Courts in this district have consistently held that a prisoner must exhaust his administrative remedies before pursuing a claim under § 2241 involving time credits. *See, e.g., Weiss v. Healy*, No. 4:23-CV-2074, 2024 WL 1858529, at *4 (N.D. Ohio Mar. 15, 2024), *report and recommendation adopted*, 2024 WL 1856545 (N.D. Ohio Apr. 29, 2024); *Conley v. Healy*, No. 5:24-cv-1430, 2025 WL 1509989, at *4 (N.D. Ohio May 28, 2025), *report and recommendation adopted*, 2025 WL 1736695 (N.D. Ohio June 23, 2025). The Warden does not dispute that Mr. DiPippa properly exhausted his administrative remedies here.

prisoner's arrival at his or her designated facility, rather than the date the prisoner is received in custody, it conflicts with the FSA and is invalid.

Following the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), federal courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id*. at 413. Instead, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [Administrative Procedure Act] requires." *Id*.

As Mr. DiPippa correctly argues, a number of courts have held that § 523.42(a) conflicts with the plain language of the FSA and is therefore invalid under *Loper Bright*. *See*, *e.g.*, *Miles v. Bowers*, 173 F.4th 372, 379 (1st Cir. 2026) (stating that any defense of § 523.42(a) "would be a non-starter" and that the regulation "plainly conflicts with the text of the FSA"); *Benson v. Warden, FCI Edgefield*, 174 F.4th 348, 356-57 (4th Cir. 2026) (holding that "the FSA does not hinge the commencement of a prisoner's sentence on his *arrival* to his BOP-designated facility" and that a prisoner's ability to earn FSA time credits "is not tied to arrival at the designated facility"); *Gale v. Warden, FCI Milan*, No. 24-13127, 2025 WL 223870, at *4 (E.D. Mich. Jan. 16, 2025) (holding that § 523.42(a) is invalid and that petitioner became eligible for FSA time credits on date he was committed to custody of the BOP) (citing cases); *Kruchten v. Rardin*, No. 25-11345, 2026 WL 325624, at *4 (E.D. Mich. Feb. 6, 2026) (holding that petitioner "became eligible to earn First Step Act time credits on October 22, 2021, the date he was sentenced and was committed to the custody of the BOP").

I agree with those well-reasoned decisions, and the Warden notably does not defend or rely on § 523.42(a) here. Instead, the Warden argues that Mr. DiPippa was ineligible for FSA time credits pursuant to a different BOP regulation, 28 C.F.R. § 523.41(c)(4)(ii), which

7

provides that an inmate is not "successfully participating" in EBRR programs or PAs if the inmate is in "[d]esignation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.)." The Warden argues that, until Mr. DiPippa arrived at FCI Elkton, he was outside of his designated institution and thus not eligible for FSA time credits.

The Warden's argument is not well-taken. Like the Warden's § 523.42(a) argument, application of § 523.41(c)(4)(ii) to Mr. DiPippa in the circumstances presented here would conflict with the FSA's plain language that an individual must have the opportunity to earn FSA time credits "throughout their entire term of incarceration." 18 U.S.C. § 3621(h)(6). As the court stated in *Sharma v. Peters*, 756 F. Supp. 3d 1271 (M.D. Ala. 2024):

> [T]he undersigned is not convinced that Sharma's purported inability to earn FTCs for which he was eligible was because he was housed outside of his designated facility. The language of 18 U.S.C. § 3632(d)(4)(B) itself imposes no such limitation or exclusions on an inmate's eligibility to earn FTCs nor does it impose any restrictions on the BOP from evaluating or determining an inmate's participation in various programming across different BOP facilities. The BOP must apply time credits to eligible prisoners who have earned them and cannot categorically make prisoners ineligible for such credits in a manner that contravenes the statutory scheme set forth in 18 U.S.C. § 3632.

*Id*. at 1284; *see also Purdy v. Bureau of Prisons*, No. 24-cv-4340 (KMM/DTS), 2025 WL 4757008, at *17 (D. Minn. Mar. 11, 2025) ("removing [petitioner] from earning status simply because he had not yet reached his designated facility, without independently evaluating whether he otherwise 'successfully participated' in programming, is a categorical bar that goes against the BOP's own regulations and the FSA"); *Pelullo v. FCC Coleman – Low*, No. 5:23-cv-189-WFJ-PRL, 2024 WL 3771691, at *5 (M.D. Fla. Aug. 13, 2024) (holding, with respect to related regulation in 28 C.F.R. § 523.41(c)(4)(iii) that inmate is not "successfully participating" while temporarily transferred to custody of another agency, that "blanket, automatic prohibition . . . appears contrary to the FSA").

It is true that, unlike here, those cases generally involved situations where an inmate was previously housed at another BOP facility. As the *Miles* court held, however, "the BOP cannot choose to house prisoners outside a federal facility (or in an interim federal facility) after commencement of their sentences, and then disregard qualifying activities undertaken at such a site if it is feasible to confirm the prisoners' participation." 173 F.4th at 384. Accordingly, I recommend that the Court hold that the BOP cannot apply § 523.41(c)(4)(ii) as a blanket bar to Mr. DiPippa earning FSA time credits prior to arriving at FCI Elkton.[2]

### C.  **Whether Mr. DiPippa was Eligible for Credits Before he Completed the Risk and Needs Assessment**

Mr. DiPippa also argues that the BOP is wrongly denying him FSA time credits for the period from February 26, 2025, when he first arrived at FCI Elkton, and May 8, 2025, the date on which BOP records indicate that Mr. DiPippa completed his risk and needs assessment.[3] I agree.

The FSA directed the Attorney General to create a "risk and needs assessment system," which the statute refers to as "the 'System.'" 18 U.S.C. § 3632(a). The FSA states that the System will be used to, among other things:

1. determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, or high risk for recidivism;

---

[2] The Warden also argues that Mr. DiPippa was not eligible to earn FSA time credits until he completed a risk and needs assessment after arriving at FCI Elkton. As discussed below in connection with Mr. DiPippa's second ground for relief, I conclude that the BOP may not deny Mr. DiPippa FSA time credits for EBRR activities of PAs simply because he engaged in those activities prior to completing a risk and needs assessment.

[3] As discussed above, Mr. DiPippa asserts that he actually completed the risk and needs assessment on February 27, 2025, but that the completed survey was not properly logged into the system. Mr. DiPippa also asserts that he retook the survey on May 6, 2025 at the direction of his case manager. The Warden notably has not responded to Mr. DiPippa's factual claims. Because I conclude that the BOP may not condition the earning of FSA time credits on prior completion of the risk and needs assessment, I need not determine whether Mr. DiPippa completed the survey earlier. If the Court rejects my recommendation and concludes that the BOP may properly require an inmate to complete a risk and needs assessment before earning any FSA time credits, the Court may wish to hold an evidentiary hearing (or to refer this matter to me for an evidentiary hearing) to determine whether Mr. DiPippa completed a survey in February 2026.

2. assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner; [and]

3. determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs . . . .

18 U.S.C. § 3632(a).

18 U.S.C. § 3621(h) further provides that the BOP must "implement and complete the initial intake risk and needs assessment for each prisoner . . . and begin to assign prisoners to appropriate evidence based recidivism reduction programs based on that determination." 18 U.S.C. § 3621(h)(1)(A). Under BOP policy, the initial risk and needs assessment is typically completed within 28 days of the prisoner's arrival at their designated BOP facility. *See* BOP Program Statement 5410.01 CN-2, First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4) (Mar. 10, 2023).

The Warden argues that, because 18 U.S.C. § 3632(a)(3) provides that the BOP will assign programming to eligible prisoners based on the prisoner's risk and needs, only programs the BOP specifically assigns to the prisoner after completion of the risk and needs assessment are eligible for FSA time credits. Courts are deeply divided on that question, and a number of courts have agreed with the Warden's argument. *See, e.g., White v. Dismas Charities, Inc.*, No. 3:25-CV-00642-JHM-RSE, 2025 WL 3091703, at *4 (W.D. Ky. Oct. 31, 2025), *report and recommendation adopted*, 2025 WL 3097290 (W.D. Ky. Nov. 5, 2025) (holding that petitioner was not entitled to FSA time credits until he completed risk and needs assessment); *Trivedi v. Entzel*, No. 25-47-DLB, 2025 WL 1370014, at *1-2 (E.D. Ky. Apr. 21, 2025) (holding that BOP "acted properly and in full conformity with the First Step Act" by denying petitioner FSA time credits before he arrived at designated facility and completed risk and needs assessment); *Villarreal-Grajeda v. Edge*, No. EP-25-CV-601-KC, 2026 WL

10

2020474, at *4-5 (W.D. Tex. July 13, 2026) (holding that prisoner could not have "successfully participated" in EBRR programming until he arrived at designated facility and completed risk and needs assessment, and that there were "practical reasons" supporting BOP rule); *Silva v. Eischen*, No. 25-cv-44 (JMB/DTS), 2025 WL 4670933, at *2 (D. Minn. Oct. 10, 2025)"), *report and recommendation adopted*, 2026 WL 896833 (D. Minn. Apr. 1, 2026) ("It necessarily follows . . . that prisoners cannot participate in FSA-qualified programming until after they have undergone [a risk and needs] assessment").

Other courts, however, including the First Circuit in *Miles*, have rejected that interpretation and have held that the BOP may not categorically prohibit inmates from earning credits before they complete the risk and needs assessment. The *Miles* court first noted that it was far from clear that the BOP had a blanket prohibition on inmates earning credits before completing the risk and needs assessment. To the contrary, the BOP's counsel apparently conceded on appeal "that credits may be given – and sometimes are given – for pre-assessment prisoner activities considered by the BOP as 'sufficiently equivalent' to an EBRR program or PA." *Miles*, 173 F.4th at 376; *see also Claude v. Stover*, No. 3:24-cv-961 (KAD), 2025 WL 375074, at *10 (D. Conn. Feb. 3, 2025) ("in two other cases concerning this issue, the BOP has conceded that it permits inmates to earn FSA time credits for programming that was not specifically assigned to them or was completed before the risk and needs assessment was performed") (citing *Mohammed v. Stover*, No. 3:23-CV-757 (SVN), 2024 WL 1769307, at *4 (D. Conn. Apr. 23, 2024); *Perevoznikov v. Stover*, No. 3:23-CV-767 (OAW), 2024 WL 5265287, at *4 (D. Conn. Aug. 8, 2024)).[4]

---

[4] The Warden argues that the statements of BOP counsel in other cases are not subject to judicial estoppel and do not prevent the Warden from arguing here that the risk and needs assessment is a prerequisite to earning credits. I do not give estoppel effect to those statements.

Moreover, the *Miles* court was "unpersuaded by the BOP's assertion that it can at will, and categorically, reject a prisoner's participation in pre-assessment programming without examining the circumstances . . . ." 173 F.4th at 380. The court further held that "the statutory obligation to provide prisoners 'with the opportunity to actively participate in' EBRR programs during 'their entire term of incarceration,' 18 U.S.C. § 3621(h)(6), is incompatible with the BOP's claim that it can refuse to credit prisoners' participation in programming that it later determines meets the prisoners' 'specific criminogenic needs' simply because that participation preceded the assessment that identifies those needs." *Id*. at 381.

Instead, the First Circuit concluded that "the FSA's mandate to give prisoners the opportunity to participate in EBRR programs throughout their term of imprisonment requires the BOP to award credits for successful participation in EBRR programs or their equivalent when that participation occurs after the starting point set by the statute – the commencement of the sentence – regardless of the timing of the risk and needs assessment." *Id*.; *see also Puana v. Williams*, No. 24-cv-01088-CNS, 2024 WL 4932514, at *3 (D. Colo. Dec. 2, 2024) ("The BOP can make these determinations [that an activity is one recommended based on the inmate's risk and needs assessment] before or after an inmate has completed an EBRR or PA.")

A number of district court decisions, including at least one from this circuit, are in accord. *See Woods v. Rardin*, No. 2:25-cv-12832, 2026 WL 1696648, at *4 (E.D. Mich. June 11, 2026) (holding that permitting BOP to deny credits prior to completion of risk and needs assessment "would do nothing more than perpetuate the illegal effects of an illegal regulation"); *Baker v. Rosalez*, No. 1:24-cv-1362-RP, 2025 WL 2299373, at *1 (W.D. Tex. Aug. 8, 2025) (holding that prisoners are eligible for FSA time credits prior to arriving at

designated facility and completing risk and needs assessment); *Modeste v. Birkholz*, 809 F. Supp. 3d. 891, 901 n. 74 (D. Alaska 2025) ("The Court is not persuaded by Respondent's suggestion that the BOP's decision to wait to conduct an individualized risk and needs assessment until prisoners arrive at their designated facility necessarily means that prisoners cannot receive time credits for participation in EBRRs or PAs prior to their assessment."); *Kvashuk v. Warden, FCI Berlin*, No. 23-cv-007-SE, 2024 WL 4349850, at *4 (D.N.H. Sept. 30, 2024) ("crediting prisoners for their participation in such programming whenever they are in BOP custody, including before their arrival at their first BOP-designated facility, comports with the FSA's purpose of expanding federal prisoners' access to programs that address their criminogenic needs over their term of imprisonment"); *Borker v. Bowers*, No. 24-10045-LTS, 2024 WL 2186742, at *2 (D. Mass. May 15, 2024) (holding that BOP's argument "amounts to an end run around the plain language of the FSA" and creates "a Catch-22, which the Court cannot endorse").

After careful consideration, I agree with those courts who have rejected the Warden's argument and have held that an inmate is eligible to earn FSA time credits for EBRR activities and PAs that the inmate engages in prior to completing the risk and needs assessment, so long as those activities correspond to the needs the BOP ultimately identifies in the assessment. That interpretation best gives effect to the plain language of the FSA, including the FSA's clear statement that inmates are eligible to participate in EBRR activities for "their entire term of incarceration." 18 U.S.C. § 3621(h)(6).

The Warden makes two primary arguments in response. First, the Warden argues that the Court should not construe any provisions of the FSA, such as § 3632(d)(4)(A)'s statement that a prisoner "shall earn" time credits, in isolation. The Warden argues that the FSA's

13

scheme, read as a whole, indicates that prisoners are only eligible for time credits that are "part of the System, which means assignment by the BOP and tailoring based on a prisoner's criminogenic needs." (ECF No. 18, PageID # 167). The Warden also correctly notes that, under the FSA, the BOP must determine a prisoner's recidivism risk before FSA time credits may be applied to reduce the prisoner's sentence. *See* 28 U.S.C. § 3624(g)(1).

However, "the fact that the risk and needs assessment is a prerequisite for <u>applying</u> credits does not mean that it is a prerequisite for <u>earning</u> them." *Miles*, 173 F.4th at 381 (emphasis in original). Rather, BOP regulations "can be read to allow credit for programming that precedes the assessment so long as – once the assessment is done – the BOP's recommendation covers the type of programming in which the inmate previously participated." *Id*. at 383. Accordingly, I agree with *Miles* and other similar decisions that "if all other FSA requirements are met," a prisoner may "accrue FSA credits before undergoing the risk and needs assessment." *Id*.

The Warden also argues that Mr. DiPippa has not offered evidence that the activities he engaged in were appropriate for his criminogenic needs as determined by the BOP. But there is no indication that the BOP determined Mr. DiPippa's pre-assessment activities were *inconsistent* with his criminogenic needs. Instead, it appears that the BOP applied a blanket rule that, because Mr. DiPippa engaged in EBRR activities and PAs before he completed his assessment and without the BOP specifically assigning those activities to him, he could not receive any FSA time credits for them.

I do not intend to suggest that Mr. DiPippa is necessarily entitled to additional FSA time credits, merely that he is entitled to have the BOP determine whether his pre-transfer and pre-assessment activities are consistent with his criminogenic needs and eligible for FSA

14

time credits based on the risk and needs assessment that the BOP ultimately performed. *See Kruchten*, 2026 WL 325624, at *4 (holding that question of whether petitioner participated in appropriate EBRR or productive activities was "an issue for the BOP to address when it undertakes its recalculation of Petitioner's FTCs"); *Grushko v. Warden*, No. 3:25-cv-02300, 2026 WL 962409, at *3 (M.D. Pa. Apr. 9, 2026) (ordering BOP to recalculate petitioner's FSA time credits, and stating that issues of whether petitioner successfully participated in appropriate programming and number of credits earned were issues for BOP to address upon recalculation).

I also emphasize that my recommendation should not be read to suggest that prisoners are automatically entitled to habeas relief simply because the BOP used the wrong date for FSA time credit eligibility or because the BOP required an inmate to complete the risk and needs assessment before earning credits. Rather, a number of courts have held that habeas relief is unwarranted where the prisoner fails to provide any evidence that he or she actually participated in EBRR programming or PAs during the disputed period. *See, e.g., White v. Warden, FCI – Cumberland*, 164 F.4th 326, 331 (4th Cir. 2026) (holding that BOP properly withheld time credits when "the record does not demonstrate, nor does it at all suggest, that [petitioner] participated in or completed any programming" before arriving at designated facility); *Harris v. Warden, FCI – Leavenworth*, No. 25-3086, 2026 WL 1146299, at *6 (10th Cir. Apr. 28, 2026) (unpub.) ("We . . . conclude that habeas relief is unwarranted where, as here, the evidence is insufficient to show the prisoner has earned FTCs through actual participation."); *Cook v. Gunther*, No. CV-25-00966-PHX-KML (ASB), 2025 WL 3490728, at *7 (D. Ariz. Sept. 16, 2025), *report and recommendation adopted*, 2025 WL 3170931 (D. Ariz. Nov. 13, 2025) ("Petitioner has not shown that he participated at all in any . . . programs

15

or activities from the time he was sentenced until he arrived at his designated facility . . . .

Therefore, Petitioner could not have earned any credit during that period under the language

of the statute.").

I fully agree with the reasoning of those decisions. Here, however, Mr. DiPippa has

presented evidence that he participated in EBRR programming and PAs while he was at

Butler County Prison and NEOCC awaiting transfer. Mr. DiPippa has further presented

evidence that he participated in EBRRs and PAs between February 26, 2025, when he arrived

at FCI Elkton, and May 8, 2025, when BOP records indicate that he completed the

assessment. The Warden has not argued that it would be impossible to confirm or evaluate

those activities. Mr. DiPippa is therefore entitled to a reassessment of whether he should

receive additional FSA time credits for the disputed periods.

Accordingly, I recommend that the Court grant Mr. DiPippa's petition for a writ of

habeas corpus and order the Warden to recalculate Mr. DiPippa's FSA time credits within 14

days of the date of the Court's order adopting my report and recommendation. In recalculating

Mr. DiPippa's time credits, the Warden should determine whether activities Mr. DiPippa

engaged in before transferring to FCI Elkton and/or before completing the risk and needs

assessment entitle him to additional credits. In doing so, the Warden should refrain from

applying any regulation, rule, or policy that inmates are ineligible for FSA time credits until

they arrive at their designated institution or until they complete the risk and needs assessment.

Finally, I recommend that the Court order the Warden to file a status report within three days

of the deadline to complete the recalculation, confirming that it has taken place as ordered.

## IV. RECOMMENDATION

For the foregoing reasons, I RECOMMEND that the Court GRANT Mr. DiPippa's

petition for a writ of habeas corpus under 28 U.S.C. § 2241. I also recommend that the Court

16

ORDER the Warden to recalculate Mr. DiPippa's FSA time credits within 14 days of the date of the Court's order adopting my report and recommendation. Finally, I recommend that the Court order the Warden to file a status report within 3 days of the deadline to recalculate Mr. DiPippa's FSA time credits, confirming that the recalculation has taken place.

Dated:  July 31, 2026

*/s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

### NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds

17

to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).